HERMAN JONES LLP
SERINA M. VASH
N.J. Bar No. 041142009
153 Central Avenue #131
Westfield, NJ  07090
Telephone:  862/250-3930
svash@hermanjones.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
STUART A. DAVIDSON (*pro hac vice* forthcoming)
FACUNDO M. SCIALPI (*pro hac vice* forthcoming)
ISABELLE KLAYMAN (*pro hac vice* forthcoming)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sdavidson@rgrdlaw.com
fscialpi@rgrdlaw.com
iklayman@rgrdlaw.com

Attorneys for Plaintiffs and the Class

[Additional counsel listed in signature block.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTA KIRBY and MARK RIVERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SANOFI-AVENTIS U.S. LLC and QUTEN RESEARCH INSTITUTE, LLC,<br><br>Defendants. | No. _____<br><br>CLASS ACTION COMPLAINT<br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Christa Kirby and Mark Rivers (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint ("Action") against Defendants Sanofi-Aventis U.S. LLC ("Sanofi") and Quten Research Institute, LLC ("Quten") (collectively, "Defendants"). Plaintiffs allege the following based on personal knowledge as to themselves, investigation by their counsel, and upon information and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Defendants once again make bold promises of superior product performance that they cannot scientifically support. As Yogi Berra once said, "It's déjà vu all over again."[1]

2.     Not too long ago, Defendants were subject to a ten-year, federal district court injunction prohibiting them from making false claims about Qunol-branded CoQ10 absorption rates.[2]

---

[1]   Yogi-isms, Yogi Berra Museum & Learning Ctr., https://yogiberramuseum.org/about-yogi/yogisms/.

[2]   Final J. & Order Approving Class Action Settlement; Awarding Class Counsel Fees & Expenses; Awarding Class Representative Bruno an Incentive Award; &

3.    Remarkably, within three years of that injunction's lapsing, Defendants are back at it with their Qunol Liquid CoQ10 promotion, making the same core marketing message that got them in trouble in the first place: that Qunol Liquid CoQ10 provides superior absorption compared to competing CoQ10 products.

4.    In sum, Defendants advertise, market, and promote Qunol Liquid CoQ10 as having "superior absorption compared to regular CoQ10," along with other similar absorption and efficacy-related representations, which are false and/or misleading. Scientific testing has revealed that Qunol Liquid CoQ10 does not possess the absorption advantages Defendants promise consumers.

5.    Nevertheless, even after facing litigation, judicial scrutiny, and being subjected to a ten-year injunction for similar conduct, Defendants have returned to a pattern of false promises. Rather than course correcting, Defendants simply repackaged their false claims and proceeded to sell the same deception.

6.    Defendants' conduct reflects a deliberate and recurring pattern: identify a desirable product attribute, advertise it aggressively, charge consumers a premium for it, and ignore the science.

---

Dismissing Action with Prejudice at 3, *Bruno v. Quten Rsch. Inst., LLC*, No. 8:11-cv-00173-DOC-E (C.D. Cal. Mar. 13, 2013), ECF 185.

7.      Accordingly, this Action seeks to hold Defendants accountable for repeating the very conduct that got them in trouble over ten years ago, with the hope that this lesson finally sinks in.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action, pursuant to 28 U.S.C. §1332(d)(2), as (a) the matter in controversy exceeds $5,000,000, exclusive of interest and costs; (b) the Class consists of more than 100 potential Class members; and (c) at least one Plaintiff is a resident of a different state from at least one Defendant.

9.      This Court has supplemental subject matter jurisdiction over the related state consumer protection law claims under 28 U.S.C. §1367, as all claims arise from the same facts and circumstances and form part of the same case or controversy.

10.     Venue properly lies in this District pursuant to 28 U.S.C. §1391, because at least one Plaintiff resides and Defendants reside, are found, have their principal place of business, have an agent, or have transacted substantial business within the District of New Jersey within the meaning of 28 U.S.C. §1391(a) as defined in 28 U.S.C. §1391(c), and because a substantial portion of the events giving rise to the claims alleged herein occurred throughout the United States, including in the District of New Jersey.

4

## THE PARTIES

11.     Plaintiff Christa Kirby ("Kirby") is a citizen and resident of New Jersey and purchased Qunol-branded Liquid CoQ10 ("Liquid CoQ10") for her own personal and household use and not for resale. On May 19, 2026, Kirby purchased Liquid CoQ10 from Amazon.com for $29.99, which was delivered to her residence in New Jersey.

12.     Plaintiff Mark Rivers ("Rivers") is a citizen and resident of California and purchased Liquid CoQ10 for his own personal and household use and not for resale in California. On May 14, 2026, Rivers purchased Liquid CoQ10 for $29.62 on Defendants' Qunol.com website and had it shipped to his home in Los Angeles, California.

13.     Defendant Quten is a New Jersey corporation with its principal place of business located at 10 Bloomfield Avenue in Pine Brook, New Jersey. Quten manufactures all of Qunol's products, including Liquid CoQ10. As the manufacturer, Quten labels, markets, and distributes Qunol products, including Liquid CoQ10.

14.    As of September 29, 2023, Quten is a wholly owned subsidiary of Defendant Sanofi-Aventis U.S. LLC ("Sanofi").[3]

15.    Sanofi is a Delaware corporation with its headquarters and principal place of business located at 100 Morris Street in Morristown, New Jersey.

## FACTUAL ALLEGATIONS

**Coenzyme Q10 Is a Popular Dietary Supplement**

16.    Coenzyme Q10 ("CoQ10") is an antioxidant the body naturally produces, and produces less of as people grow older.[4] CoQ10 has been studied for its role in reducing oxidative stress and supporting cardiovascular and metabolic health.[5]

17.    Medical research has indicated that taking CoQ10 may improve congestive heart failure symptoms, lower cholesterol in diabetes patients, ease muscle pains and weaknesses, and shorten the duration and intensity of migraines.[6]

---

[3]    Sanofi, *Media Update: Sanofi completes acquisition of Qunol®* (Sep. 29, 2023), https://www.sanofi.com/en/media-room/press-releases/2023/2023-09-29-15-59-05-2752155.

[4]    Mayo Clinic Staff, *Coenzyme Q10*, Mayo Clinic (May 22, 2025), https://www.mayoclinic.org/drugs-supplements-coenzyme-q10/art-20362602.

[5]    Richard Diechmann et al., *Coenzyme Q10 and Statin-Induced Mitochondrial Dysfunction*, 10 OSCHNER J., 16, 21 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3096178/.

[6]    Mayo Clinic Staff, *supra* note 4.

Doctors may recommend their patients take CoQ10 supplements because "[t]here is accumulating evidence that some diseases of aging may benefit from [taking] supplemental ubiquinol or CoQ10 treatment[,]"[7] to replenish depleted CoQ10 levels in the body.[8]

18.    Thus, consumers purchase CoQ10 supplements for a variety of purposes, including supporting cardiovascular health, maintaining healthy energy production, addressing age-related declines in endogenous CoQ10 levels, and promoting overall wellness.[9]

19.    Moreover, 35% of Americans are prescribed statins.[10] Statins are "prescription drugs people take to lower their level of LDL, or 'bad' cholesterol that builds up in arteries."[11] Prolonged statin use can lead to decreases in the body's

---

[7]   Isabella Peixoto de Barcelos & Richard H. Haas, *CoQ10 and Aging*, 8 Biology 28 (May 11, 2019), https://doi.org/10.3390/biology8020028.

[8]   Stacey Colino, *Should I Take a CoQ10 Supplement?*, TIME (Apr. 14, 2026), https://time.com/article/2026/04/14/should-i-take-CoQ10-supplement/.

[9]   *See infra* ¶20.

[10]   Sarah Bradley, *Statin statistics*, SingleCare (Mar. 27, 2026), https://www.singlecare.com/blog/news/statin-statistics/.

[11]   Cleveland Clinic, *Statins*, Medical Treatments (Mar. 12, 2024), https://my.clevelandclinic.org/health/treatments/22282-statins; *see also* Arun Manmadhan, M.D., *Statins: What are the Pros and Cons?*, Columbia Doctors (Aug. 17, 2023), https://www.columbiadoctors.org/news/statins-what-are-pros-and-cons.

natural production of the coenzyme Q10,[12] leading statin users to take CoQ10 supplements to recover their loss of the enzyme.[13]

20.    For all these reasons, CoQ10 has become one of the most widely consumed dietary supplements in the United States.[14]

21.    Unsurprisingly, CoQ10 supplements are widely available at major retailers, including major pharmacy chains,[15] Amazon,[16] and Costco,[17] and are easily accessible to consumers throughout the United States.

22.    CoQ10 supplements are popularly sold in many forms, including soft gel capsules, oral spray, hard shell capsules, tablets, gummies, and liquids.[18]

---

[12]  Richard Diechmann et al., *supra* note 5.

[13]  *Id.*

[14]  Albert E. Raizner, *Coenzyme Q10*, 15 Methodist Debakey Cardiovascular J., 185, 191 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6822644/.

[15]  CVS.com, Best Coq10 Supplements, https://www.cvs.com/shop/vitamins/supplements/coq10/q/Top_Rated/tp (last visited June 9, 2026); Walgreens.com, Coq10, https://www.walgreens.com/q/coq10 (last visited June 9, 2026).

[16]  Amazon.com, *CoQ10 Nutritional Supplements*, https://www.amazon.com/CoQ10-Nutritional-Supplements/b?node=3774561 (last visited June 5, 2026).

[17]  Costco Wholesale Corp., *CoQ10 Enzyme*, https://www.costco.com/coq10-enzyme.html (last visited June 5, 2026).

[18]  Ravij Saini, *Coenzyme Q10: The Essential Nutrient*, 2 J. Pharm. BioAllied Sci. 466 (2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC3178961/.

**Properties of CoQ10**

23.    CoQ10, also known as ubiquinone, is a "fat-soluble, vitamin-like molecule naturally present in every cellular membrane within [human] bodies."[19]

24.    CoQ10 serves an essential biological function in mitochondrial energy production.[20] As Figure 1 below illustrates, CoQ10 facilitates electron transport within the mitochondrial respiratory chain and contributes to the production of adenosine triphosphate ("ATP"), the primary source of cellular energy.[21]

---

[19] Brittany Sood et al., *Coenzyme Q10*, StatPearls (StatPearls Publishing LLC, 2024), https://www.ncbi.nlm.nih.gov/books/NBK531491/.

[20] *Id.*

[21] *Id.*

**Figure 1**[22]



25.    However, it is widely recognized in the scientific literature that "CoQ10 is lipophilic and has extremely poor water solubility; it is known for its low bioavailability and delivery properties[,]"[23] and "due to its lipophilic nature[ ] [and] large molecular weight[.]"[24]

---

[22]  Richard Diechmann et al., *supra* note 5.

[23]  Huafeng Zhou et al., *Novel Lipid-Free Nanoformulation for Improving Oral Bioavailability of Coenzyme Q10*, BioMed Rsch. Int'l (June 5, 2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4068099/.

[24]  Noha M. Zaki, *Strategies for oral delivery and mitochondrial targeting of CoQ10*, 23 Drug Delivery 1868 (2016), https://www.tandfonline.com/doi/epdf/ 10.3109/10717544.2014.993747.

26.    CoQ10's lipophilic nature means that it is challenging for the body to absorb CoQ10 taken orally.[25]

27.    To combat CoQ10's absorption challenges, scientists and product developers have devised numerous formulation technologies intended to improve absorption, or CoQ10's bioaccessibility.[26] Such technologies include particle-size reduction,[27] crystal-dispersion techniques,[28] carrier oils,[29] surfactant systems,[30]

---

[25]    *Id.*

[26]    Cal. Dep't of Toxic Substances Control, *Bioaccessibility Definition* (Mar. 2021), https://dtsc.ca.gov/wp-content/uploads/sites/31/2021/03/Bioaccessibility-Def-A.pdf (defining bioaccessibility as "the fraction of the total amount of a substance that is potentially available for absorption").

[27]    Shweta Gupta et al., *Formulation Strategies to Improve the Bioavailability of Poorly Absorbed Drugs with Special Emphasis on Self-Emulsifying Systems*, ISRN Pharms. (Dec. 26, 2013), https://pmc.ncbi.nlm.nih.gov/articles/PMC3888743/.

[28]    *Id*.

[29]    T. R. Kommuru et al., *Self-emulsifying drug delivery systems (SEDDS) of coenzyme Q10: formulation development and bioavailability assessment*, 212 Int'l J. of Pharms., 233, 246 (2001), https://pubmed.ncbi.nlm.nih.gov/11165081/.

[30]    Shuqin Xia et al., *Optimization in the Preparation of Coenzyme Q10 Nanoliposomes,* 54 J. of Agricultural & Food Chemistry, no. 17, 6358, 6366 (Jan. 16, 2006), https://pubs.acs.org/doi/10.1021/jf060405o.

11

emulsions,[31] self-emulsifying delivery systems,[32] liposomal formulations,[33] and other methods designed to maintain CoQ10 in a dispersed, and, therefore improved, bioaccessible state. The ostensible scientific rationale behind these technologies is that maintaining CoQ10 in a properly dispersed or solubilized form increases the amount available for gastrointestinal uptake.[34]

28.     Critically, each of these technologies can only function as intended if the CoQ10 formulation remains physically stable in its dispersed or solubilized state.[35] A formulation that loses physical stability may experience precipitation, aggregation, phase separation, droplet coalescence, crystal growth, or other degradation phenomena that returns the CoQ10 to its crystalline form and greatly reduces bioavailability compared to CoQ10 in solubilized form.[36]

---

[31]  T. R. Kommuru et al., *supra* note 29 at 246.

[32]  *Id*.

[33]  Shuqin Xia et al., *supra* note 30.

[34]  David Mantle & Alex Dybring, *Bioavailability of Coenzyme Q10: An Overview of the Absorption Process and Subsequent Metabolism*, 9 Antioxidants (BASEL), 386 (May 5, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7278738/.

[35]  William V. Judy, *The Instability of the Lipid-Soluble Antioxidant Ubiquinol: Part 2-Dog Studies*, 20 Integrative Medicine: A Clinician's J., No. 5, 26, 30 (Oct. 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8594965/.

[36]  Shweta Gupta et al., *supra* note 27; Gary Price et al., *Drug Bioavailability*, StatPearls (StatPearls Publ'g July 30, 2023), https://www.ncbi.nlm.nih.gov/

29.     Indeed, as studies make clear, "CoQ10 in polymorphic crystalline forms will not be absorbed in the gastro-intestinal tract. CoQ10 can be absorbed only as individual molecules[,]" and "must therefore be dissociated first into individual CoQ10 molecules[,]" which "should remain fully dissociated throughout the shelf life of the CoQ10 preparation."[37]

30.     Scientists have noted that "[n]ot all CoQ10 manufacturers have demonstrated an ability to achieve this dissociation of the crystals to single molecules."[38]

31.     Scientists emphasize "the importance of CoQ10 crystal dispersion," in the formulation process, noting that "the absence of which reduces bioavailability by some 75%."[39] Therefore, the purpose and goal of advanced CoQ10 delivery systems is to maintain effective dispersion or solubilization, and prevent precipitation, aggregation, crystal formation, and other physical changes that interfere with CoQ10 absorption.[40]

---

books/NBK557852/ (defining bioavailability as "the extent a substance or drug becomes completely available to its intended biological destination(s)").

[37]   David Mantle et al., *supra* note 34.

[38]   *Id*.

[39]   *Id*.

[40]   *Id*.

32.     Maintaining CoQ10 in a stable, dispersed / solubilized state is essential to achieving the absorption advantages these technologies were designed to accomplish.[41]

33.     Accordingly, any claims that a solubilized CoQ10 product provides better bioaccessibility or superior absorption must be backed by evidence that the product is stable,[42] and maintains the CoQ10 in a dispersed / solubilized state.[43] If a solubilized CoQ10 product is unstable, and returns to crystalline form in the customer's hands, there is no scientific basis for a claim that the CoQ10 product has superior absorption or bioavailability compared to regular, crystalline CoQ10.[44]

**Qunol Liquid CoQ10**

34.     Qunol is a brand that produces and markets a liquid formulation of CoQ10.[45]

---

[41]  William V. Judy, *The Single-dose Absorption of Different CoQ10 Product Types Into the Lymph Compared to That Transported to the Blood*, 21 Integrative Medicine: a Clinician's J., No. 5, 30, 35 (Nov. 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9831132/.

[42]  *Id.*

[43]  David Mantle et al., *supra* note 34.

[44]  Shweta Gupta et al., *supra* note 27.

[45]  Qunol, *Liquid CoQ10, 100mg*, https://www.qunol.com/products/qunol-liquid-coq10 (last visited June 5, 2026).

35.    The Qunol brand first launched in 2006.[46] Since then, Qunol's product line has grown to include CoQ10 formulations in liquid, capsule, softgel, and gummy forms, and has even expanded to other active ingredients like turmeric, magnesium, and sleep-aid supplement products.[47]

36.    The Qunol brand is manufactured by Quten,[48] which was acquired by Sanofi on September 29, 2023.[49] As such, both Defendants control, direct, and are responsible for marketing, labeling, and selling Liquid CoQ10.

37.    Liquid CoQ10 bears clear product advertising that it has "superior absorption compared to regular CoQ10."[50] Qunol defines regular CoQ10 as "unsolubilized ubiquinone in oil suspensions in softgels and/or powder-filled caps/tablets."[51] Not only do Defendants display this statement on the face of the

---

[46]  PR Newswire, *Qunol Taps Legendary Skateboarder and Entrepreneur Tony Hawk as Brand Ambassador* (Jan. 4, 2023), https://www.prnewswire.com/news-releases/qunol-taps-legendary-skateboarder-and-entrepreneur-tony-hawk-as-brand-ambassador-301713421.html.

[47]  *Id.*

[48]  Hank Schultz, *Sanofi takes major healthy aging stake with Qunol acquisition*, SupplySide Supplement J. (August 2, 2023), https://www.supplysidesj.com/healthy-living/sanofi-takes-major-healthy-aging-stake-with-qunol-acquisition.

[49]  *See supra* note 3.

[50]  Qunol, *supra* note 45.

[51]  *Id.* at "Benefits" section, n.1.

15

product—on the front, in bold, capitalized font and isolated in a prominent red colored box—but they are ubiquitous in Qunol's marketing, and repeated on Qunol's own website in the product description ("this liquid supplement provides superior absorption compared to regular CoQ10, helping you increase COQ10 levels").[52] The product image and concomitant representations are replicated on both Amazon's[53] and Costco's websites,[54] as reflected in Figures 3 and 4.

---

[52] *Id.*

[53] Amazon.com, *Qunol CoQ10 Liquid Supplement 100mg, Superior Absorption, Natural Form of Coenzyme Q10, Antioxidant for Heart Health, Orange Pineapple Flavored*, https://www.amazon.com/Qunol-Superior-Absorption-Supplement-Anti oxidant/dp/B079K4G4JD?th=1 (last visited June 5, 2026).

[54] Costco Wholesale Corp., *Qunol Liquid CoQ10, 100 mg., 30.4 Fluid Ounces*, https://www.costco.com/p/-/qunol-liquid-coq10-100-mg-304-fluid-ounces/100375 487 (last visited June 5, 2026).

**Figure 3**[55]



**Figure 4**[56]

## Liquid CoQ10, 100mg, Orange Pineapple Flavor

★★★★★  4.7 (12644)   Write a review

$29.99

Support your heart health and cellular energy production with our delicious orange pineapple-flavored Liquid CoQ10.* With the #1 Cardiologist Recommended Form of CoQ10†, this liquid supplement provides superior absorption˜ compared to regularˆ CoQ10, helping you increase COQ10 levels.

---

[55]  Qunol, *supra* note 45.

[56]  *Id.*

38.     Indeed, there are only minor variations in Liquid CoQ10 marketing materials between Amazon's and Costco's virtual platforms, and both convey the same deceptive message: Liquid CoQ10 provides "superior absorption."

39.     One graphic on Amazon's platform goes so far as to depict Liquid CoQ10 with a statement beneath the product falsely claiming that, "Qunol CoQ10 dissolves in both water and fat, and therefore, provides superior absorption,"[57] as reflected in Figure 5.

---

[57]  Amazon.com, *supra* note 53.

**Figure 5**[58]



40.    Similarly, Costco's website contains images of the Liquid CoQ10 packaging, stating, "Qunol's form of CoQ10 *dissolves 100% in water and fat*,

---

[58]    *Id.*

providing *superior absorption*."[59] There is even an accompanying comparison chart

on the packaging relaying that Liquid CoQ10 has superior absorption by claiming it

is "*100%* water-soluble," *and* "*100%* fat-soluble,"[60] as reflected in Figure 6.

**Figure 6**[61]



---

[59]  Costco Wholesale Corp., *supra* note 54 (emphasis added).

[60]  *Id.*

[61]  *Id.*

41.     Costco's Product Details description again informs consumers that "Qunol Liquid CoQ10 is both water and fat soluble for superior absorption in your body compared to regular CoQ10,"[62] as reflected in Figure 7.

**Figure 7**[63]



42.     Put simply, "superior absorption" is how Defendants market and distinguish Liquid CoQ10 from all other forms of CoQ10 supplements. This is especially true as Defendants use a direct comparison of Liquid CoQ10 to "regular CoQ10."

43.     By promoting Liquid CoQ10's supposed "superior absorption," Defendants represent to consumers that Liquid CoQ10 formulation provides an additional health benefit other CoQ10 supplements cannot fulfill. This is heavily promoted as the product's principal advantage.

---

[62]  *Id.*

[63]  *Id*.

44.     Defendants price Liquid CoQ10 at a premium compared to other CoQ10 formulations[64] and compared to liquid CoQ10 formulations sold by other brands.[65] Defendants are able to upcharge for Liquid CoQ10 because of its supposed superiority.

45.     Consumers, including Plaintiffs and members of the Class, purchased Liquid CoQ10 at a premium price because they believed Defendants' representations that it facilitates "superior absorption."

**Defendants' "Patented" Technology Is Supposed to Maintain Liquid CoQ10's Stable Dispersion**

46.     Defendants attribute Liquid CoQ10's absorption advantages to proprietary water-soluble technology disclosed in U.S. Patent No. 6,455,072 ("Patent"). The Patent is entitled "Stable Aqueous Dispersion of Nutrients."[66]

47.     The Patented technology, Defendants claim, is used to make Liquid CoQ10.

---

[64]  Qunol, *CoQ10 Gummies, 100mg, Rich Orange Flavor*, https://www.qunol.com/ products/qunol-coq10-gummies-100mg?selling_plan=2646442136     (priced     at $19.99) (last visited June 6, 2026).

[65]  NOW Foods, *CoQ10 Liquid*, https://www.nowfoods.com/products/supplements/ coq10-liquid (last visited June 5, 2026) (priced at $24.99).

[66]  U.S. Patent No. 6,455,072, available at https://patents.google.com/patent/ US6455072B1/en. Notably, Defendants' Patent for Liquid CoQ10 *expired on October 10, 2020*, *id.*, which is a direct violation of 35 U.S.C. §292, exposing Defendants to civil penalties should a United States Attorney pursue the matter.

48.    To be sure, the Patent acknowledges that nutrients such as CoQ10 are not ordinarily dispersible in aqueous systems, and describes an emulsification technology intended to maintain such nutrients in a stable aqueous dispersion.[67] An emulsion is one form of a dispersion that can maintain lipophilic compounds like CoQ10 in a solubilized state.[68]

49.    However, Defendants' Patent claims that their proprietary technology prevents settling, creaming, flocculation, aggregation, and other forms of instability that interfere with uniformity and reproducible dosing.[69] The Patented emulsion technology is supposed to maintain the CoQ10 in a solubilized and stable state, so that the formulation enables superior CoQ10 absorption in the body.

50.    Defendants' absorption advantage claims, thus, depend on the application of the technology disclosed by the Patent. If the Patented technology works as intended during the Liquid CoQ10 manufacturing process, then CoQ10

---

[67]    *Id*.

[68]    Ahmad Salawi, *Self-emulsifying drug delivery systems: a novel approach to deliver drugs* 1811, 1813, Drug Delivery (June 6, 2022), https://www.tandfonline.com/doi/full/10.1080/10717544.2022.2083724 ("Lipid-based formulations [including emulsions] increase medication solubilization during GI transit and provide a lipophilic microenvironment to facilitate drug delivery to intestinal absorptive regions").

[69]    *Id*.

will be in a stable, dispersed / solubilized state where Liquid CoQ10 has greater bioavailability than regular CoQ10.

51.    However, contrary to the Patent, Defendants' Liquid CoQ10 fails to hold its emulsification (if it is emulsified at all), and instead settles, creams, flocculates, aggregates, crystallizes, and is otherwise unstable.[70]

52.    When Liquid CoQ10 has settled, creamed, flocculated, aggregated, crystallized, or is unstable in any other way, the CoQ10 within Liquid CoQ10 is not in the dispersed state the Patent describes.

53.    When Liquid CoQ10 is not in the stable, dispersed state the Patent describes, Liquid CoQ10 will not contain the necessary properties to enable superior absorption compared to other CoQ10 formulations. When this occurs, the scientific basis for Defendants' claimed absorption advantage does not exist.

54.    Like most manufactured products that claim to provide a measurable performance benefit, Liquid CoQ10 can be tested to determine whether it actually possesses characteristics consistent with better absorption. A key characteristic is whether Liquid CoQ10 is in the form of a stable emulsion when it reaches consumers.

---

[70] David Mantle et al., *supra* note 34.

55.     As mentioned, an emulsion is a type of dispersion. An emulsion consists of mixing two or more immiscible liquids together, dispersing one liquid in the other. Emulsions "fail" or "crash out" when they "revert as separate phases, oil, and water, by fusion or the coalescing of droplets."[71]

56.     The four telltale signs that an emulsion has failed, or is unstable, are: (1) creaming, (2) sedimentation, (3) flocculation, and (4) coalescence,[72] as reflected in Figure 8.

---

[71]   Marie Nicole V. David et al., *Emulsions*, StatPearls (StatPearls Publ'g July 20, 2023), https://www.ncbi.nlm.nih.gov/books/NBK559084/.

[72]   RheologyLab, *Emulsion Stability: Strong and Stable or Weak and Feeble*, https://www.rheologylab.com/articles/emulsion-stability/ (last visited June 6, 2026).

**Figure 8**[73]



57.     Thus, while "intestinal absorption of CoQ10 can be improved by emulsification,"[74] which increases CoQ10's oral bioavailability,[75] a failed emulsion will not increase CoQ10's oral bioavailability.[76]

---

[73]  *Id.*

[74]  Yuki Sato et al., *Emulsification Using Highly Hydrophilic Surfactants Improves the Absorption of Orally Administered Coenzyme Q10*, 36 Biol. & Pharm. Bull. 2012 (2013).

[75]  Pariya Thanatuksorn et al., *Improvement of the Oral Bioavailability of Coenzyme Q10 by Emulsification with Fats and Emulsifiers Used in the Food Industry*, 42 LWT–Food Sci. & Tech. 385 (2009).

[76]  Salawi, *supra* note 68 at 1817 ("If the microemulsion's phase separation is permanent, no increase in medication absorption may be expected."); *id.* at 1820 ("Physical stability is essential for a formulation's performance . . . . [S]eparation

58.   Because "emulsion formulation [is] essential for the intestinal absorption of lipophilic compounds including CoQ10[,]"[77] it is critical that the emulsion is stable.[78] "Stability is one of the fundamental properties of an emulsion, if the product doesn't remain emulsified then no claims of its . . . properties . . . will matter."[79]

59.   As such, Defendants' claim that Liquid CoQ10 has "superior absorption" compared to other CoQ10 formulations depends on whether Defendants' Liquid CoQ10 emulsification system is stable and intact when it reaches a consumer.

60.   If Liquid CoQ10 has unstable, or failed, emulsions, then Defendants' claim that Liquid CoQ10 has "superior absorption" compared to other CoQ10 formulations is false, misleading, and deceptive.

61.   As previously stated, Liquid CoQ10 claims to employ the technology covered by Defendants' Patent.[80]

---

can occur as a result of inadequate formulation physical stability, lowering bioavailability, and decreasing therapeutic effectiveness.").

[77]   Yuki Sato et al., *supra* note 74 at 2016.

[78]   RheologyLab, *supra* note 72.

[79]   *Id.*

[80]   *See, e.g.*, Qunol, *supra* note 45; Amazon.com, *supra* note 53.

**Scientific Testing Revealed That Liquid CoQ10 Does Not Have Characteristics of "Superior Absorption Compared to Regular CoQ10"**

62.    Plaintiffs each purchased Liquid CoQ10 that was submitted for expert examination. Testing of both Plaintiffs' Liquid CoQ10 revealed visible crystallization and agglomeration of CoQ10, indicating that the emulsion failed and was not stable.

63.    Because Liquid CoQ10 is not in a stable, dispersed state, there is no scientific basis to support Defendants' "superior absorption" claims for Liquid CoQ10. Therefore, Liquid CoQ10 is no better than any regular, unsolubilized CoQ10 product.

64.    Defendants' representation that Liquid CoQ10 has "superior absorption," as applied to each and every Liquid CoQ10 purchase or sale in the United States, is untrue, misleading, or deceptive.

**Defendants Have Previously Been Enjoined from Making False and/or Misleading Representations About Their CoQ10 Products**

65.    On March 13, 2013, a ten-year injunction was entered against Quten, prohibiting Quten "from labeling or advertising Qunol as six times more effective or providing six times more absorption than competing products or 'regular CoQ10.'"[81]

---

[81]    *Bruno*, *supra* note 2.

28

66.     It will come as no surprise that one of the at-issue Qunol products in *Bruno* was Liquid CoQ10.[82] There, plaintiff alleged that defendants labeled and advertised its CoQ10 products, including Liquid CoQ10, as being six times more effective than other CoQ10 formulations without having any scientific substantiation.[83]

67.     Three years after the *Bruno* injunction ended, Defendants again claim that Liquid CoQ10 provides "superior absorption compared to regular CoQ10." However, as alleged herein, Liquid CoQ10's absorption is no better than regular unsolubilized CoQ10 formulations or products.

68.     Because Defendants cannot substantiate their "superior absorption" claims, Defendants' representations that Liquid CoQ10 provides "superior absorption compared to regular CoQ10" are false, deceptive, unfair, and misleading to consumers.

69.     There is still more. Besides *Bruno*, Quten was hauled back into court on May 24, 2024, when a plaintiff alleged that Quten misrepresented dosage

---

[82] Complaint ¶1, *Bruno v. Quten Rsch. Inst., LLC*, No. 8:11-cv-00173 (C.D. Cal. Jan. 31, 2011), ECF 1.

[83] *Id.*

amounts of certain magnesium, turmeric, CoQ10, and fish oil Qunol products.[84] The court found that plaintiff's claims had merit when it denied Quten's motion to dismiss plaintiff's California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act claims, and pursuit of injunctive relief.[85]

70.     Time and again, Defendants have demonstrated that they simply cannot abstain from making untrue, misleading, and deceptive statements to consumers.

71.     Like past occurrences, Defendants intend that consumers rely on their "superior absorption" representations when making their purchasing decisions. It is no coincidence that the representation that Liquid CoQ10 has "superior absorption compared to regular CoQ10" was prominently and conspicuously displayed on the Liquid CoQ10 packaging itself and on websites facilitating the purchase of such. Defendants intended that this representation was apparent and obvious to consumers, and would, thus, influence their purchasing decisions.

72.     Reasonable consumers, such as Plaintiffs and members of the Class, have been deceived by Defendants' Liquid CoQ10 "superior absorption" representations.

---

[84]  Complaint ¶¶1-2, *Swetala v. Quten Rsch. Inst., LLC*, No. 1:24-cv-00620 (E.D. Cal. May 24, 2024), ECF 1.

[85]  Order Granting in Part & Denying in Part Def.'s Mot. to Dismiss at 9, 16, *Swetala v. Quten Rsch. Inst., LLC*, No. 24-cv-00620 (E.D. Cal. Mar. 28, 2025), ECF 35.

## PLAINTIFFS' COMMON EXPERIENCES

73.    On May 19, 2026, Kirby purchased Liquid CoQ10 for her own personal and household use and not for resale from Amazon.com for $29.99, which was delivered to her residence in New Jersey.

74.    Kirby saw and relied on Defendants' representations regarding Liquid CoQ10's "superior absorption" when she made her purchasing decision, and was, in fact, injured as a result of Defendants' false, misleading, and deceptive representations.

75.    If Defendants told the truth about their Liquid CoQ10, Kirby would not have suffered the damages related to her purchase of Liquid CoQ10.

76.    On May 14, 2026, Rivers purchased Liquid CoQ10 for $29.62 on Defendants' Qunol.com website and had it shipped to his home in Los Angeles, California.

77.    Rivers saw and relied on Defendants' representations regarding Liquid CoQ10's "superior absorption" when he made his purchasing decision, and was, in fact, injured as a result of Defendants' false, misleading, and deceptive representations.

78.    If Defendants told the truth about their Liquid CoQ10, Rivers would not have suffered the damages related to his purchase of Liquid CoQ10.

31

79.     Plaintiffs have suffered injury in fact, lost money, and suffered an ascertainable loss at the time of purchase as a result of Defendants' conduct because they were exposed to and purchased, at a premium price, Liquid CoQ10 in reliance on Defendants' false representations, but did not receive the "superior absorption" they were promised.

80.     Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

81.     Plaintiffs have a future desire to purchase Qunol Liquid CoQ10 if the representations made therein are true.

## CLASS ACTION ALLEGATIONS

82.     Plaintiffs bring this Action in accordance with Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and the following classes.

(a)     The National Class is defined as:

All persons who purchased Defendants' Qunol Liquid CoQ10 in the United States for their own personal or household use rather than for resale or distribution.

(b)     The New Jersey Class is defined as:

All persons who purchased Defendants' Qunol Liquid CoQ10 in the state of New Jersey for their own personal or household use rather than for resale or distribution.

(c)     The California Class is defined as:

32

All persons who purchased Defendants' Qunol CoQ10 in the state of California for their own personal or household use rather than for resale or distribution.[86]

83.     Subject to additional information obtained through further investigation and discovery, the foregoing Class definitions may be expanded or narrowed by amendment or amended complaint.

84.     Specifically excluded from the Class are Defendants, their parents, subsidiaries and affiliates, directors and officers, and members of their immediate families. Also excluded from the Class are the Court, the Court's spouse, all persons within the third degree of relationship to the Court and its spouse, and the spouses of all such persons.

85.     *Numerosity*. The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis, allege that the Class contains many hundreds of thousands of members. The precise number of members of the Classes is unknown to Plaintiffs. The true number of members of the Class is known by the Defendant, however, and thus, may be notified of the pendency of this action by first-class mail, electronic mail, and by published notice.

---

[86]   For ease of reference, the National Class, New Jersey Class, and California Class may be referred to herein as "the Class."

86. ***Existence and Predominance of Common Questions of Law and Fact***.

Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual questions include, but are not limited to, the following:

(a)    whether the superior absorption claims discussed above are true, or are misleading, or reasonably likely to deceive consumers;

(b)    whether Defendants' alleged conduct violates public policy;

(c)    whether the alleged conduct constitutes violations of the laws asserted herein;

(d)    whether Defendants engaged in false or misleading advertising;

(e)    whether Plaintiffs and the members of the Class have sustained monetary loss and the proper measure of that loss;

(f)    whether Plaintiffs and members of the Class are entitled to injunctive relief; and

(g)    whether Plaintiffs and members of the Class are entitled to declaratory relief.

87. ***Typicality***. Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected, and their claims arise from the same or substantially similar conduct.

88.     *Adequacy of Representation*. Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have retained counsel highly experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

89.     *Superiority*. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages individual members of the Class suffered are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendants. It would, thus, be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if members of the Class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

90.     The Class may also be certified under Rule 23(b)(2) because:

(a)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

91.    The claims asserted herein are applicable to all consumers who purchased Qunol Liquid CoQ10.

92.    Adequate notice can be given to members of the Class directly using information maintained in Defendants' records or through notice by publication.

93.    Damages may be calculated, in part, from the sales information maintained in Defendants' records, so that the cost of administering a recovery for the Class can be minimized. Likewise, the precise amount of damages available to Plaintiffs and the other members of the Class is not a barrier to class certification.

## CAUSES OF ACTION

### COUNT I
**Violations of the New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. §56:8-1, *et seq.*)**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively,**
**Plaintiff Kirby and the New Jersey Class)**

94.    Plaintiffs reallege and incorporate the previous paragraphs 1 through 93 as if fully set forth herein.

95.    This cause of action is brought under the New Jersey Consumer Fraud Act, N.J. Rev. Stat. §56:8-2, *et seq.* ("NJCFA"). NJCFA is designed to protect consumers from deceptive, unfair, and unconscionable trade practices.

96.    Plaintiffs and members of the Class are "persons" within the meaning of N.J.S.A. §56:8-1(d).

97.    Pursuant to N.J. Rev. Stat. §56:8-2, the NJCFA makes unlawful

[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

98.    As alleged herein, Defendants' wrongful actions relating to Liquid CoQ10 marketing and promotion violate the NJCFA.

99.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J.S.A. §56:8-1(c) and (d).

37

100. Defendants committed unfair or deceptive acts and practices by engaging in the unfair and deceptive practices as described herein:

(a)    representing Liquid CoQ10 provides "superior absorption compared to regular CoQ10";

(b)    representing that Liquid CoQ10 has characteristics or benefits that it does not possess;

(c)    representing that Liquid CoQ10 is of a particular standard and quality when it is not; and/or

(d)    advertising, marketing, and selling Liquid CoQ10 in a manner likely to mislead reasonable consumers regarding the Product's absorption.

101.   The foregoing unfair and deceptive acts and practices are misleading in a material way because they fundamentally misrepresent Liquid CoQ10 absorption characteristics and efficacy to consumers, and consumers considered the representation in making their purchasing decisions.

102.   Had consumers known Liquid CoQ10 did not possess "superior absorption" qualities, Plaintiffs and members of the Class would not have purchased Liquid CoQ10 or would have paid substantially less.

103.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class purchased Liquid CoQ10 and paid more for the

38

Product than they otherwise would have paid, thereby suffering an ascertainable loss.

**COUNT II**
**Violations of California's Consumers Legal Remedies Act**
**(Cal. Civ. Code §1750, *et seq.*)**
**(On Behalf of Plaintiff Rivers and the California Class)**

104. Plaintiff Rivers realleges and incorporates the allegations in paragraphs 1 through 93 as if fully set forth herein.

105. California's Consumers Legal Remedies Act ("CLRA") prohibits unfair methods of competition and unfair or deceptive acts or practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

106. Rivers and members of the California Class are "consumer[s]," within the meaning of Cal. Civ. Code §1761(d).

107. Liquid CoQ10 is a "good" within the meaning of Cal. Civ. Code §1761(a).

108. Rivers and each proposed member of the California Class's purchase of Liquid CoQ10 constituted a "transaction" within the meaning of Cal. Civ. Code §1761(e).

109. Defendants' policies, acts, and practices were designed to, and did, result in the purchase and use of Liquid CoQ10 for personal, family, or household purposes, and violated, and continue to violate, the following sections of the CLRA:

39

(a)   Cal. Civ. Code §1770(a)(5), by knowingly, recklessly, and/or intentionally representing that Liquid CoQ10 has characteristics, uses, benefits, and quantities which it does not have;

(b)   Cal. Civ. Code §1770(a)(7), by representing that Liquid CoQ10 absorption and efficacy was better compared to other CoQ10 products or formulations of such; and

(c)   Cal. Civ. Code §1770(a)(9), by knowingly, recklessly, and/or intentionally advertising Liquid CoQ10 with intent not to sell it as advertised.

110.   Defendants' misrepresentations were material, as reasonable consumers such as Rivers and members of the California Class would deem Liquid CoQ10's absorption and efficacy rates important in determining whether to purchase Liquid CoQ10.

111.   Rivers and members of the California Class saw the representation that Liquid CoQ10 had "superior absorption compared to regular CoQ10" on Liquid CoQ10 labeling and packaging, or on any purchasing platforms, such as Amazon.com or Costco. Rivers and members of the California Class purchased Liquid CoQ10, relying on the representation.

112.   Had consumers known Liquid CoQ10 did not possess "superior absorption" qualities, Rivers and members of the California Class would not have purchased Liquid CoQ10 or would have paid substantially less.

113.    As a direct and proximate result of these violations, Rivers and members of the California Class have been or are at imminent risk of being harmed, and that harm will continue unless Defendants are enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of Liquid CoQ10.

114.    On June 12, 2026, counsel for Rivers sent Defendants written notice (via United States certified mail, return receipt requested) that their conduct violates the CLRA.

115.    If Defendants fail to provide appropriate monetary relief for their violations of California Civil Code §§1770(a)(5), (7), and (9) within thirty (30) days of receipt of Rivers' notice, Rivers and the California Class will amend this Action pursuant to California Civil Code §1782(b) to seek all available relief under California Civil Code §1780, including: (a) actual damages pursuant to California Civil Code §1780(a)(1); (b) restitution of property pursuant to California Civil Code §1780(a)(3); (c) punitive damages pursuant to California Civil Code §1780(a)(4); and; (d) such other relief as the Court deems proper pursuant to California Civil Code §1780(a)(5).

116.    For now, pursuant to CLRA §1782(d), Rivers seeks an order enjoining the above-described wrongful acts and practices of Defendants, and for restitution and disgorgement of all monies obtained from the sale of Liquid CoQ10.

41

117. Pursuant to CLRA §1780(d), Rivers has prepared and attached a venue declaration stating facts showing that this action has been commenced in a county described as a proper place for the trial. *See* **Exhibit A**.

118. Rivers seeks an award of attorneys' fees pursuant to, *inter alia*, California Civil Code §1780(e) and California Code of Civil Procedure §1021.5.

## COUNT III
### Violations of California's False Advertising Law
### (Cal. Bus. & Prof. Code §17500, *et seq.*)
### (On Behalf of Plaintiff Rivers and the California Class)

119. Plaintiff Rivers realleges and incorporates the allegations in paragraphs 1 through 93 as if fully set forth herein.

120. California's False Advertising Law ("FAL") prohibits any statement made in connection with the sale or advertisement of goods or services "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

121. As set forth herein, Defendants represented that Liquid CoQ10 had "superior absorption compared to regular CoQ10," among other representations described in this Action, on the labeling, packaging, or any online platform where Liquid CoQ10 was sold, such as Amazon.com or Costco.

122. These representations were false, misleading, and likely to deceive reasonable consumers.

123. Defendants knew or reasonably should have known that the foregoing representations were false and misleading because the Liquid CoQ10 formulation was scientifically unable to facilitate "superior absorption."

124. Defendants' misrepresentations were material, as reasonable consumers such as Rivers and members of the California Class would deem Liquid CoQ10's absorption and efficacy rates important in determining whether to purchase Liquid CoQ10.

125. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Rivers' desire to purchase Liquid CoQ10 in the future if Rivers can be assured that the Liquid CoQ10 is advertised truthfully.

126. Rivers and members of the California Class are entitled to injunctive and equitable relief, as well as restitution in the amount of the premium price they paid for Liquid CoQ10.

**COUNT IV**
**Violations of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §17200, *et seq.*)**
**(On Behalf of Plaintiff Rivers and the California Class)**

127. Plaintiff Rivers realleges and incorporates the allegations in paragraphs 1 through 93 as if fully set forth herein.

128. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, prohibits any "unlawful," "fraudulent," or "unfair" business

43

act or practice and any false or misleading advertising. In pertinent part, the UCL provides that "unfair competition shall mean and include unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

**Fraudulent**

129. Defendants' representations that Liquid CoQ10 has "superior absorption compared to regular CoQ10," including any related statements of absorption or solubility alleged herein, are likely to deceive the public.

130. Defendants' fraudulent representations were ubiquitous, and Plaintiffs and California Class members were exposed to such representations through Defendants' long-term advertising campaign. Accordingly, actual reliance may be presumed.

**Unlawful**

131. As alleged herein, Defendants' misrepresentations that Liquid CoQ10 has "superior absorption compared to regular CoQ10," including any related statements of absorption or solubility alleged herein, violate at least the following laws:

    (a)    the CLRA, California Business & Professional Code §1750, *et seq.*;

44

(b)   the FAL, California Business & Professional Code §17500, *et seq.*; and

(c)   Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45.

**Unfair**

132. Defendants' conduct with respect to the advertising, marketing, labeling, packaging, and sale of Liquid CoQ10 is unfair because Defendants' conduct was immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of such conduct, if any, does not outweigh the gravity of the harm to consumers.

133. Defendants' conduct with respect to the advertising, marketing, labeling, packaging, and sale of Liquid CoQ10 is also unfair because it violates public policy as declared by specific constitutional, statutory, and regulatory provisions, including, but not limited to, California's FAL and the CLRA.

134. Defendants' conduct with respect to the advertising, marketing, labeling, packaging, and sale of Liquid CoQ10 is also unfair because the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or competition, and is not an injury that consumers themselves could reasonably have avoided.

135. Rivers and members of the California Class believed the representations made about Liquid CoQ10 absorption and efficacy, and found the

45

statements to be material when making their purchasing decisions. Had Rivers and members of the California Class known Liquid CoQ10 did not possess "superior absorption" qualities, they would not have purchased Liquid CoQ10 or would have paid substantially less.

136.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent practices and acts, Plaintiffs and the California Class were injured and lost money or property, including, but not limited to, the premium price paid for Liquid CoQ10.

137.   In accordance with California Business and Professions Code §17203, Rivers seeks an order enjoining Defendants from continuing to engage in the fraudulent, unfair, and unlawful acts and practices alleged herein, including the advertising, marketing, labeling, packaging, and sale of Liquid CoQ10 using the false and misleading "superior absorption" representations described in this Action. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

138.   Rivers, on behalf of himself and members of the California Class, also seeks an order for restitution and disgorgement of all monies obtained from the sale of Liquid CoQ10 that were unjustly acquired through Defendants' fraudulent, unfair, and unlawful business practices, declaratory and equitable relief, and attorneys' fees and costs.

46

## COUNT V
## Declaratory Judgment Act
## (28 U.S.C. §2201)
## (On Behalf of Plaintiffs and the Class)

139. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 93 as if fully set forth herein.

140. In connection with the active case and controversy between Plaintiffs and Defendants, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §2201.

141. An actual, present, and justiciable controversy exists about whether Defendants' Liquid CoQ10 "superior absorption" representations are truthful and/or lawful.

142. Defendants market, advertise, label, and sell Liquid CoQ10, representing that it provides "superior absorption compared to regular CoQ10."

143. Plaintiffs contend that those representations are false, misleading, and unlawful because scientific, expert testing demonstrated that Liquid CoQ10 does not possess the absorption advantages Defendants claim it provides.

144. Defendants continue to market and sell Liquid CoQ10 using the false, misleading, and unlawful representations.

145. The ongoing controversy directly implicates the parties' legal rights and obligations under concrete state consumer protection statutes, specifically:

(a)    whether Defendants' misrepresentations constitute an unconscionable commercial practice, deception, and/or fraud under the New Jersey Consumer Fraud Act (N.J.S.A §56:8-2);

(b)    whether Defendants' misrepresentations constitute an unfair, deceptive, or misleading practice that misrepresents the ingredients, characteristics, or standards of goods under the CLRA (Cal. Civ. Code §1770(a)(5), (7), and (9));

(c)    whether Defendants' business practices are unlawful, unfair, or fraudulent under the UCL (Cal. Bus. & Prof. Code §17200); and

(d)    whether Defendants' misrepresentations constitute false and misleading advertising under the FAL (Cal. Bus. & Prof. Code §17500).

146.    This controversy is live, real, and immediate. Plaintiffs and members of the Class face a concrete, imminent threat of future injury. Plaintiffs and members of the Class continue to see Liquid CoQ10 available for purchase at major retailers, including Amazon.com and Costco, and desire to purchase Liquid CoQ10 in the future if it were truthfully and accurately labeled. However, absent a judicial declaration, Plaintiffs and members of the Class cannot rely on the truthfulness of Defendants' representations, and, thus, are restricted in their ability to confidently purchase Liquid CoQ10.

147.    A declaration from this Court is necessary, useful, and appropriate to terminate and afford relief from the uncertainty, insecurity, and controversy giving

48

rise to this action. Relying solely on retrospective damages will not prevent Defendants from continuing to use deceptive, false, or misleading representations in Liquid CoQ10 marketing, labeling, and packaging, nor will it remedy any prior inaccurate information Defendants already disseminated in the market concerning Liquid CoQ10 absorption and efficacy.

148.   Pursuant to 28 U.S.C. §2201, Plaintiffs request a judicial declaration from this Court establishing that:

(a)   The representation of "superior absorption" on Liquid CoQ10's labeling, packaging, and advertising is false, misleading, and deceptive to a reasonable consumer;

(b)   Defendants' conduct in manufacturing and selling Liquid CoQ10 with this label violates the NJCFA, CLRA, UCL, and FAL; and

(c)   Defendants remain under a legal obligation to correct, modify, or remove the misrepresentation from all future iterations of Liquid CoQ10's packaging.

## COUNT VI
### Permanent Injunction
### (On Behalf of Plaintiffs and the Class)

149.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 93 as if fully set forth herein.

150. Plaintiffs bring this claim for permanent injunctive relief to restrain Defendants from continuing to engage in the unlawful, unfair, and deceptive business practices described herein, pursuant to this Court's inherent equitable powers and the express statutory authorizations granted under:

      (a)     the NJCFA, N.J.S.A. §56:8-19;

      (b)     the CLRA, Cal. Civ. Code §1780;

      (c)     the UCL, Cal. Bus. & Prof. Code §17203; and

      (d)     the FAL, Cal. Bus. & Prof. Code §17535.

151. Plaintiffs and Class Members have suffered, and will continue to suffer, irreparable injury to their property and monetary interests as a direct result of Defendants' ongoing manufacture, marketing, distribution, and sale of Liquid CoQ10 bearing the false and misleading representation of "superior absorption."

152. Unless restrained and enjoined by this Court, Defendants will continue to manufacture, market, distribute, and sell Liquid CoQ10 with any "superior absorption" misrepresentation.

153. This ongoing conduct poses a real, immediate, and continuing threat to Plaintiffs and members of the Class, who purchase Liquid CoQ10 at regular intervals.

154. Absent a permanent injunction, Plaintiffs and members of the Class face an imminent risk of future deception because Defendants' labeling remains uncorrected.

155. Remedies available at law, such as retrospective monetary damages or restitution, are inadequate to compensate Plaintiffs and members of the Class for this ongoing harm.

156. The balance of the hardships between Plaintiffs and members of the Class on the one hand and Defendants on the other, tips in favor of Plaintiffs and members of the Class. This is because Defendants are in exclusive control of Liquid CoQ10 advertising and labeling and have the power to change the untruthful advertising and labeling.

157. The public interest would not be disserved by a permanent injunction.

158. Plaintiffs have a future desire to purchase Qunol Liquid CoQ10 if the representations made therein are true.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as to each and every count, including:

A.      The Court determining that this Action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this Action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      An Order awarding declaratory relief, declaring that Defendants' conduct violates the statutes and laws referenced herein, consistent with applicable law, and pursuant to causes of action raised herein;

C.      An Order for permanent injunctive relief prohibiting Defendants from asserting that Qunol Liquid CoQ10 has "superior absorption compared to regular CoQ10" or has "superior absorption" properties generally;

D.      An Order requiring Defendants to bear the cost of class notice;

E.      An Order compelling Defendants to conduct a corrective advertising campaign;

F.      An Order requiring Defendants to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

G.      An Order compelling Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or a fraudulent business act or practice, untrue or misleading advertising, or

a violation of state statutes described herein, plus pre- and post-judgment interest thereon;

H.    Actual, compensatory, exemplary, statutory, treble, and nominal damages under all causes of action alleged herein;

I.    Punitive damages to punish and deter Defendants from continuing to make misrepresentations to consumers;

J.    Costs, expenses, and reasonable attorneys' fees; and

K.    Any other and further relief the Court deems necessary, just, or proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  June 15, 2026                HERMAN JONES LLP
                                     SERINA M. VASH
                                     N.J. Bar No. 041142009


                                        /s *Serina M. Vash*
                                     Serina M. Vash

                                     153 Central Avenue #131
                                     Westfield, NJ  07090
                                     Telephone:  862/250-3930
                                     svash@hermanjones.com

                                     HERMAN JONES LLP
                                     JOHN C. HERMAN*
                                     3424 Peachtree Road NE, Suite 1650
                                     Atlanta, GA  30326
                                     Telephone:  404/504-6555
                                     jherman@hermanjones.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
STUART A. DAVIDSON*
FACUNDO M. SCIALPI*
ISABELLE KLAYMAN*
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sdavidson@rgrdlaw.com
fscialpi@rgrdlaw.com

Attorneys for Plaintiffs and the Class

* *Pro hac vice* forthcoming

54